ROBERTS, J.,
for the Court:
¶ 1. A jury sitting before the Tippah County Circuit Court found Chad Booker guilty of manslaughter. The circuit court sentenced Booker to twenty years in the custody of the Mississippi Department of Corrections (MDOC), with ten years suspended and five years of post-release supervision. Aggrieved, Booker appeals and raises six issues. Suffice it to say, Booker raises issues regarding the sufficiency of the evidence, jury instructions, and four of the circuit court’s evidentiary rulings. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. The events that set Booker’s conviction into motion began as a dispute between neighbors who all lived near the intersection of County Roads 813 and 817 in the Palmer Community of Tippah County, Mississippi. That dispute culminated in the death of sixty-one year old David White. White and his adult son, Keith White (Keith), owned an All-Terrain Vehicle shop that was located behind White’s house. Booker’s parents, Buster and Frieda Booker, lived across the street from White. Booker, who had his own home near his parents and White, was a twenty-three-year-old veteran of the United States Army at the time his dispute with White arose. As of March 2007, Booker operated an auto body shop and studied radiology at Blue Mountain College.
¶ 3. On Saturday, March 10, 2007, White and Keith were working at their ATV shop. Booker drove a 1990s model Ford Mustang by the ATV shop. According to Keith, Booker drove the Mustang at approximately seventy to eighty miles per hour. Booker and his passenger, Tyler Medlin, disputed that. They testified that Booker drove between forty and fifty miles per hour. White was of the opinion that Booker was driving too fast. When White and Keith heard the Mustang coming back, White went outside and flagged Booker down. According to both Booker and Medlin, White came running outside and angrily told Booker that he was driving too fast. When Booker said that he was test driving the Mustang because he could not get it to shift into third gear, White said, “Not on my d— road!” Med-lin and Booker both later testified that Booker remained calm and told White that *993 he should call the authorities if he had a problem. When White returned to his house, he did exactly that.
¶ 4. Unfortunately, that was not the end of the dispute. According to Keith, later that evening, Booker stopped at the end of White’s driveway, put his truck in neutral, and revved the engine. Keith testified that Booker drove past White’s house approximately four times that night, and on his last pass, he yelled “f— you.” Shade White (Shade), Keith’s son and White’s grandson, also testified that he heard Booker’s truck stop in front of the house either four or five times and that he heard Booker rev his engine.
¶ 5. White’s wife, Charlotte White (Charlotte), testified that Booker’s parents each called their house on Sunday afternoon at separate times regarding the confrontation between White and Booker. According to Charlotte, the call from Booker’s parents led to a discussion about whether White should apologize to Booker. White did not think he needed to apologize to Booker. However, Charlotte testified that the last thing she heard White say regarding the subject was, “I’m going to apologize.”
¶ 6. It is undisputed that Booker beat White to death the next evening. Phillip “Possum” Nance gave statements to Terry Cox, an investigator employed by Booker’s defense attorney, and Agent John Hill-house of the Mississippi Bureau of Investigation (MBI).[1] In both statements, Nance said that Booker stopped by his used car dealership on March 12th. According to Nance, Booker told him about his confrontation with White two days earlier. Nance stated that Booker was confused as to why White had called the police. Nance told Agent Hillhouse that Booker was calm and that he did not say anything about getting back at White. However, Nance also said that, according to Booker, during the confrontation the previous Saturday, Booker told White that he could call the authorities, or Booker could get out of the Mustang so they could “settle it like men.”
¶7. On Monday, March 12, 2007, Keith and White were returning home from picking up an ATV. Keith testified that, on their way home, they saw Booker at his shop, and they waved at him. Keith testified that Booker waved back. Booker later corroborated Keith’s testimony. According to Keith, after they arrived at their shop, White decided to go apologize to Booker in an attempt to make peace. Keith testified that he watched White drive his Yamaha Rhino ATV to Booker’s house. Keith went back in the shop. Keith also testified that White appeared calm when he left.
¶ 8. According to Booker, White came “flying over” to his house in the Rhino. Booker said that White turned off the Rhino, got out of it quickly, and told Booker that he had to talk to him. Booker testified that he told White to leave his property because he did not want to talk to him. Booker also testified that White said, ‘You’re going to talk to me.” According to Booker, White attempted to grab Booker’s collar with one hand and tried to punch him with the other hand. Booker testified that he grabbed White’s wrist, and while pulling White toward him, he punched White in the face three times. Booker further testified that White stumbled away and sat back in the Rhino.
¶ 9. Booker walked away from the scene of the altercation. According to Booker, White was still standing when he left. Booker later explained that he walked down the road and called his cousin Wendell Booker (Wendell). Booker asked *994 Wendell to come get him because he “had been in a bad situation.” Shortly after Wendell picked him up, Booker’s mother called him. Booker returned to his shop, where he was taken into custody by officers with the Tippah County Sheriffs Department.
¶ 10. Brenda Morgan, a certified nurse who formerly worked in the emergency room and intensive-care unit of the local hospital, happened to drive by the scene a short time later. Morgan knew White, but she did not recognize him. She stopped solely because she saw someone slumped over in an ATV. White was unconscious and slumped over the center console of the Rhino. The left side of White’s face was extremely swollen, and he was bleeding from both ears and his nose. Blood was on the center console shift handle. White’s glasses were in the middle of the road, and his baseball cap was on the passenger-side floorboard. Morgan did not detect a pulse on White’s wrist or his neck. Morgan called 911, and then she and Jeff Butler, who also stopped as he drove by, got White out of the ATV and began to perform CPR. Another of White’s neighbors, Clinton Bryant, drove by and noticed that something appeared to be wrong with White. Bryant found Keith and told him that White appeared to need help. When Keith arrived at Booker’s house, he found Morgan and Butler tending to his father. Despite the efforts of emergency responders, White was unable to recover from his injuries.
¶ 11. Booker was indicted for murder. He pled not guilty and opted to go to trial. At the conclusion of Booker’s trial, the circuit court instructed the jury on murder and manslaughter; the jury found Booker guilty of manslaughter. Booker appeals and raises the following six issues: (1) the circuit court erred in denying Booker’s motions for a directed verdict, a judgment notwithstanding the verdict, and a new trial; (2) the circuit court failed to properly instruct the jury; (3) the circuit court erred in allowing Morgan to give opinion testimony; (4) the circuit court erred in allowing Shade to testify; (5) the circuit court erred in refusing to admit evidence offered by Booker; and (6) the circuit court erred in allowing testimony concerning where White’s cap was found. We find no merit to Booker’s arguments on appeal.
ANALYSIS
I. WEATHERSBY RULE
¶ 12. Booker first alleges that the circuit court erred in denying his motions for a directed verdict, a judgment notwithstanding the verdict, and a new trial. Booker relies on the Weathersby rule, which states, “where the defendant or the defendant’s witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.” Weathersby v. State, 165 Miss. 207, 147 So. 481, 482 (1933).
¶ 13. Booker argues that “[t]he applicability of the Weathersby rule is a determination for the court.... ” Johnson v. State, 987 So.2d 420, 425 (¶ 10) (Miss. 2008). However, the supreme court in Johnson held that there are instances when the Weathersby rule does not apply. Id. at 425 (¶ 11). “[I]f the defendant or the defendant’s eyewitnesses’ testimon[ies] satisf[y] all the elements of murder or manslaughter, the defendant would not be entitled to a directed verdict of acquittal, as their testimonies] would be the basis for a valid conviction.” Id.
¶ 14. Mississippi Code Annotated section 97-3-35 (Rev.2006) defines man *995 slaughter as “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense .... ” Booker’s version of the incident satisfies the elements of manslaughter; therefore, the circuit court was within its discretion to determine that the Weath-ersby rule did not apply. Therefore, this issue is without merit.
II. JURY INSTRUCTIONS
¶ 15. Booker actually raises two distinctly separate claims in this issue. First, Booker claims the circuit court erred when it instructed the jury pursuant to the prosecution’s manslaughter instruction, which was designated as instruction S-2A. Second, Booker claims the circuit court erred when it denied three of his proffered jury instructions. We analyze each claim separately. However, the same standard of review applies to both of Booker’s arguments on appeal. This Court’s review of a challenge to jury instructions has been stated as follows:
The Court does not single out any instruction or take instructions out of context; rather, the instructions are to be read together as a whole. A defendant is entitled to have jury instructions given which present his theory of the ease. This entitlement is limited, however, in that the court is allowed to refuse an instruction which incorrectly states the law, is covered fairly' elsewhere in the instructions, or is without foundation in the evidence.
Spicer v. State, 921 So.2d 292, 313 (¶ 43) (Miss.2006) (quoting Parks v. State, 884 So.2d 738, 746 (¶ 26) (Miss.2004)).
A. Manslaughter Instruction
¶ 16. Booker takes issue with instruction S-2A, which reads as follows:
If you find from the evidence in this case beyond a reasonable doubt that on March 12, 2007, in Tippah County, Mississippi, the deceased, [White], was a living person, and he died as a result of [Booker] striking him in the head by the use of deadly force, and while defendant was angry, acting in the heat of passion, and not in necessary self-defense, then you shall find the defendant guilty of manslaughter.
Booker argues that instruction S-2A misstates the elements of manslaughter because the jury was not instructed that it could only find him guilty of manslaughter if he killed White in a cruel or unusual manner or by using a dangerous weapon.
¶ 17. Booker admitted that he punched White in the head several times, which resulted in White’s death. At best, the evidence indicates that Booker landed three punches to the left side of White’s head while White was attempting to punch him. At worst, Booker punched White in the head while White remained seated in the Rhino. Either of these scenarios is sufficient to constitute a “cruel or unusual manner.” Therefore, S-2A properly instructed the jury that it had to find that Booker struck White in the head with deadly force in order to find him guilty of manslaughter. We find no error with this instruction.
B. Booker’s Refused Instructions
¶ 18. Booker claims the circuit court erred when it refused three of his proffered jury instructions. Those three jury instructions were designated as instructions D-3, D-5, and D-6. Although there are subtle differences within each instruction, the core substance of all three proffered instructions centers on Booker’s self-defense theory.
i. Proffered Instruction D-3
¶ 19. Booker argues that the circuit court erred when it refused proffered in *996 struction D-3. Instruction D-3 originally read as follows:
The Court instructs the jury that you are not to judge the actions of Chad Booker[ ] in the cool, calm light of after-developed facts, but instead you are to judge [Booker’s] actions in the light of the circumstances confronting ... Booker, at the time, as you believe that those circumstances reasonably appeared to ... Booker[ ] on that occasion; and if you believe under those circumstances it reasonably appeared to ... Booker, at the instant that David White was attacking him and was attempting to cause him serious bodily harm, that ... Booker then and there had reasonable ground to apprehend an action on the part of ... White to put his life in jeopardy, or to cause ... Booker[ ] some great personal injury, and that there reasonably appeared to ... Booker[ ] to be imminent danger of such designs being accomplished, ... Booker[ ] was justified in defending the attack by ... White, and further if you believe from the evidence that ... White died as a result of a blow to the head and that the fatal blow was delivered either accident[al]Iy or in self[-]defense, then you must find ... Booker[ ] not guilty.
The prosecution objected to proffered instruction D-3. The prosecution argued that it contained a comment on the evidence. Booker’s attorney agreed to “take out the language that is upsetting to the State and may be argumentative.” The circuit court announced that it would reconsider proffered instruction D-3 after reviewing the remaining proffered jury instructions.
¶ 20. After considering the other proffered instructions, the circuit court returned to its consideration of proffered instruction D-3. Booker’s attorney informed the circuit court that he had revised proffered instruction D-3. The revised version — styled as instruction D-3-A reads as follows:
The Court instructs the jury that you are not to judge the actions of Chad Booker[ ] in the cool, calm light of after-developed facts, but instead you are to judge [Booker’s] actions in the light of the circumstances confronting ... Booker, at the time, as you believe that those circumstances reasonably] appeared to ... Booker[ ] on March 12, 2007.
Having heard no objection to instruction D-3-A, the circuit court granted it, and it was read to the jury. In other words, Booker claims that the circuit court erred when it refused to instruct the jury pursuant to proffered instruction D-3 regardless of Booker’s consent to revise it and the fact that it was actually given after it had been revised.
¶ 21. Though Booker consented to revising proffered instruction D-3, he now claims it was reversible error. However, jury instructions may not include comments on the weight of the evidence. Millsap v. State, 767 So.2d 286, 293 (¶ 25) (Miss.Ct.App.2000) (citing Duckworth v. State, 477 So.2d 935, 937-38 (Miss.1985); Voyles v. State, 362 So.2d 1236, 1244 (Miss.1978)). Proffered instruction D-3 contained language that unequivocally stated that “David White was attacking [Booker] and was attempting to cause him serious bodily harm.” It was disputed that White was the initial aggressor. Consequently, the circuit court properly refused proffered instruction D-3.
¶22. Furthermore, there was no error in omitting the self-defense language that was included in the original version of proffered instruction D-3. The circuit court instructed the jury pursuant to Booker’s instruction titled as instruction D-7, which reads as follows:
The Court instructs the jury that to make a killing justifiable on the grounds *997 of self-defense, the danger to the defendant must be either actual, present and urgent, or the defendant must have reasonable grounds to believe that the victim intended to kill the defendant or to do him some great bodily harm, and in addition to this, he must have reasonable grounds to believe that there is imminent danger of such act being accomplished. It is for the jury to determine the reasonableness of the grounds upon which the defendant acts. If you, the jury, unanimously find that the defendant acted in self-defense, then it is your sworn duty to return a verdict in favor of the defendant.
Additionally, instruction S^i states:
The court instructs the jury that to make a killing justifiable on the grounds of self[-]defense, the defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm; and in addition to this he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the ground upon which the defendant acts.
¶ 28. A defendant is entitled to have jury instructions given that present his theory of the case, but a circuit court may refuse an instruction if the substance of that instruction is included in another instruction. Heidel v. State, 587 So.2d 835, 842 (Miss.1991). “A trial court is not required to give instructions which are covered by other instructions although the language may differ.” Davis v. State, 431 So.2d 468, 475 (Miss.1983) (superceded by rule). Considering that: (a) Booker’s attorney agreed to revise proffered instruction D-3; (b) instruction D-3-A was given; (c) proffered instruction D-3 contained an impermissible comment on the evidence; and (d) the redacted portions of proffered instruction D-3 were fairly covered by other instructions, the circuit court properly refused to instruct the jury pursuant to proffered instruction D-3.
ii. Proffered Instruction D-5
¶ 24. Next, Booker claims the circuit court erred when it refused proffered instruction D-5. Proffered instruction D-5 reads as follows:
The Court instructs the jury ... that when a person is assailed by another person whose conduct indicates the intention and ability to imminently do the assailed person some great bodily harm, and the person assailed had good reason to believe and does believe that he is in imminent danger of being killed or suffering great bodily harm, when the person assailed is justified under the law, even to the taking of the life of his assailant in protecting his own life or limb, or that of another.
The circuit court refused proffered instruction D-5 on the basis that it included a comment on the evidence.
¶ 25. Proffered instruction D-5 implied that Booker was being “assailed by another person.” As stated previously, an instruction may not comment on the evidence. Furthermore, Booker’s defense theory was properly addressed in instructions D-7 and S-4. Proffered instruction D-5 was simply cumulative of other court instructions on self-defense. There is no merit to Booker’s argument that the circuit court erred when it refused proffered instruction D-5.
iii. Proffered Instruction D-6
¶26. Proffered instruction D-6 reads as follows:
If the jury finds that the Defendant, Chad Booker, was lawfully on his own property and was not the aggressor pri- *998 or to the assault on his person by David White, and the Defendant, Chad Booker, defended himself in a manner calculated to subdue the immediate threat of harm to his person in a manner consistent to that of a reasonable person, and David White died as a result of this lawful resistance in the form of a tragic accident, then you must find the Defendant, Chad Booker, not guilty.
¶ 27. The circuit court did not err when it refused proffered instruction D-6. First and foremost, Booker’s defense theory was that he was acting in necessary self-defense. Whether Booker was “lawfully on his own property,” on his father’s property, or in the highway right-of-way was irrelevant. Additionally, proffered instruction D-6 is confusing in that it appears to instruct the jury that White initiated an assault upon Booker. Whether White was the initial aggressor was a question of fact for the jury to resolve. Moreover, there was no evidence that White died as a result of a “tragic accident.” Booker testified that he deliberately grabbed White’s wrist and intentionally struck White in the face three times. It was only White’s subsequent death that Booker did not intend. That unintended result forms the basis of Booker’s claim of accident. Such an intentional act followed by an unintended consequence cannot serve as a basis for excusable homicide, accident, and misfortune. Miss.Code Ann. § 97-3-17 (Rev.2006); Montana v. State, 822 So.2d 954, 962 (¶30) (Miss.2002). Finally, to the extent that proffered instruction D-6 is a self-defense instruction, Booker’s self-defense theory was adequately covered by instructions S-4 and D-7. “A trial judge is under no obligation to grant redundant instructions.” Montana, 822 So.2d at 961 (¶ 26) (citation omitted).
¶ 28. To summarize, the circuit court acted well within its discretion in declining to instruct the jury pursuant to the three instructions at issue. Booker’s second issue is without merit.
III. MORGAN’S LAY-OPINION TESTIMONY
¶ 29. According to Booker, the circuit court abused its discretion when it allowed Morgan to testify, over objection, regarding whether White would have been able to sustain the injuries that Booker caused and then be mobile enough to walk back to the Rhino ATV. The relevance and admission or exclusion of evidence is a matter of the trial court’s discretion that will be reversed only for an abuse of discretion which results in prejudice to a party. Shearer v. State, 423 So.2d 824, 826 (Miss.1982). However, the trial court must exercise its discretion within the bounds of the Mississippi Rules of Evidence. Gates v. State, 936 So.2d 335, 339 (¶ 11) (Miss.2006) (citing Johnston v. State, 567 So.2d 237, 238 (Miss.1990)).
¶ 30. During direct examination, Morgan testified that she had been a registered nurse since 1981. Since that time, she had been an emergency-room nurse and a nurse in an intensive-care unit. She was the first person to arrive at the scene of the homicide. Morgan further testified that White was unconscious when she found him slumped over in his Rhino ATV. Morgan then went on to testify that she felt for White’s radial pulse and his carotid pulse, but she was not able to detect a pulse at either location. Morgan called 911 before she and Butler began performing CPR on White.
¶ 31. Morgan also testified as to the visible extent of White’s injuries. Despite the fact that she personally had known White for some time, she testified that she did not recognize him until she saw the *999 relatively uninjured right side of White’s face. Morgan testified that White was bleeding from both ears. According to Morgan, bleeding from the ears “indicates something that has happened pretty bad, a severe trauma.” There was no objection to that portion of Morgan’s testimony on direct examination.
¶ 32. Later, the prosecution asked Morgan whether White would have been mobile after he sustained his injuries. To be specific, the transcript reflects that the following exchange took place:
Q. Based on your observations and your experience as a human being and as a nurse, do you think Mr. White would have ever been mobile after receiving those injuries?
BY [COUNSEL FOR BOOKER]: Objection, your Honor. I don’t think he’s got the proper predicate. The proper predicate has not been laid to ask that question, and we would so move to object.
BY THE COURT: Overruled. You may continue.
Q. When you first go there and saw who you later determined was Mr. White, based on the injuries that you saw, do you believe that the person who received those injuries would have ever been able to move?
A. No, sir.
Morgan did not answer the question to which Booker’s attorney objected. After the prosecution rephrased its question, Booker’s attorney did not object. Be that as it may, Morgan testified that she believed White would not have been mobile after Booker hit him.
¶ 33. Booker’s defense theory was that he acted in necessary self-defense. According to Booker, White got out of his Rhino ATV and grabbed him when Booker turned to walk away. Booker claimed that White was the initial aggressor. Morgan’s testimony was harmful to Booker’s defense theory because if White never left the Rhino ATV, or if he was sitting in it when Booker hit him, then Booker’s version of events was not very credible.
¶ 34. On cross-examination, Booker’s attorney asked Morgan whether she could say that White was inside the Rhino ATV when Booker beat him. Morgan answered, “[n]o sir.” On redirect, the prosecution asked Morgan the following question: “Based on what you observed that day, do you think there’s any way that Mr. White received those injuries anywhere else from right where he was sitting?” Booker’s attorney objected, but the circuit court allowed Morgan to answer. Morgan then responded, “[f]rom the extent of the injury to his head, no, sir. I mean, from the looks of what I saw, it happened where he was sitting.”
¶ 35. Booker’s attorney objected again and stated: “She just said she couldn’t say how it happened, and now to allow the State to elicit that, that contradicts what she just previously said.” The prosecution responded that Morgan’s statement on rebuttal did not contradict her testimony during cross-examination. The circuit court overruled Booker’s objection, and Morgan again testified that, in her opinion, White sustained his fatal injuries where he was sitting.
¶ 36. The State contends that by initially objecting based on the prosecution’s failure to lay the “proper predicate” for Morgan’s opinion testimony, Booker did not specifically object on the basis that the question called for an expert opinion. The State is correct that an objection on one ground at trial waives all other grounds for an objection on appeal. Carter v. State, 722 So.2d 1258, 1261 (¶ 13) (Miss.1998) (citation omitted). However, “[w]here the specific grounds for objection *1000 are apparent from the context, a general objection is sufficient to preserve the error for appeal.” Id. at 1261-62 (citing Barnette v. State, 478 So.2d 800, 803 (Miss.1985)). It is apparent from the context of Booker’s objection that Booker was arguing that the prosecution had not qualified Morgan as an expert witness. Therefore, Booker preserved this issue for consideration on appeal.
¶ 37. The prosecution did not attempt to qualify Morgan as an expert in the traditional sense. Accordingly, she could only provide her opinion as a lay witness. A lay witness may testify as to his or her non-expert opinion evidence if “(a) [the opinion is] rationally based on the perception of the witness and (b) [is] helpful to the clear understanding of ... the determination of a fact in issue[.]” M.R.E. 701. If there was any error in the circuit court’s decision that the question at issue did not call for an expert opinion — which we expressly do not find — any such error was harmless in light of the totality of the evidence.
¶ 38. Where a lay witness testifies to matters that require qualification as an expert witness, any error in admitting the lay witness’s testimony is harmless if the lay witness’s testimony was cumulative because a properly qualified expert witness testified to the same effect. Le v. State, 913 So.2d 913, 937 (¶ 80) (Miss.2005) (citation omitted). In Young v. State, 981 So.2d 308, 312 (¶ 15) (Miss.Ct.App.2007), a defendant argued that the trial court had erred in an arson case when it allowed a deputy fire marshall who had not been qualified as an expert witness in the area of fire investigation to testify regarding the origin of a fire and whether the fire had been intentionally set. This Court held that, assuming for the sake of argument that the trial court had erred, any such error was harmless because the guilty verdicts were supportable irrespective of the witness’s testimony; and thus, this was not a ground for reversal. Id. at 313 (¶¶ 16,18).
¶ 39. Dr. Steven Hayne testified before Morgan testified. Dr. Hayne performed the autopsy on White. During direct examination, the prosecution asked Dr. Hayne the following question: “Based on your observation of Mr. White, would you expect that a person in a standing position who received this amount of force to the head could remain standing when receiving that lick?” Dr. Hayne responded: “It would be unlikely, Counselor, unless he was supported by some means. If there’s more than one blow, then I would expect the person to fall unless supported.” The following exchange then transpired:
Q. Would the ability of the body to — if there’s more than one blow, would the ability of the body to move upon being struck have any effect on the possible injury? If I hit something that can fall or can move on a second or subsequent lick, would that have any bearing on its ability to withstand that blow?
A. I think, Counselor, if the person’s head were in a fixed position where it could not move and the injury is delivered, I don’t think you would see the types of injuries to the brain. If the head is unsupported, it’s not fixed, it’s not braced against something, that’s when you’re going to get rapid movement of the head producing the injuries, so I would strongly favor that the head itself was not supported when the force was delivered to the head.
Q. Would the relationship of the head and the torso, one being immobilized and one being mobilized, have any bearing on that?
A. Well, if the torso is immobilized, but the head remains mobile, then you could achieve the types of injuries sustained.
*1001 ¶ 40. During cross-examination, the following exchange between Booker’s attorney and Dr. Hayne transpired:
Q. Is it possible for Mr. White to have received a blow or blows and received a concussion and still remained on his feet and gotten back into his vehicle?
A. I couldn’t exclude that, Counselor, but I think, that would be very unlikely. In these type of injuries, I would expect the person to suffer a concussion, which you cannot see medically; but statistically, it’s far more probable that the individual suffered a concussion which by definition a person loses consciousness. It may only be for a very short period of time. It may be a second or two or three seconds, and then regain consciousness, and then subsequently lose consciousness again before death. Q. So he could have received a concussion, been out on his feet, not gone down, regained consciousness, and gotten in his vehicle?
A. It would be possible, Counselor. I couldn’t exclude that.
Q. You could not exclude that, could you?
A. But I would not favor that at all.
Q. You could not contradict that under oath, could you, if that’s what testimony reveals?
A. I could not exclude that, Counselor, but I would not favor that.
Q. I understand, but my question to you is this: If we have testimony that Mr. White got out of his vehicle and accosted the defendant, grabbed him and swung at the defendant, and the defendant caught his hand, the swing by Mr. White, and he grabbed Mr. White and pulled him to him and hit him three times and released him, and that Mr. White did not go down but Mr. White went back and got in his vehicle, you can’t contradict that that occurred, can you, if that’s what the proof shows?
A. I cannot exclude that, Counselor, but again, I would not favor that scenario.
Q. But you weren’t there, were you?
A. No, sir.
Q. Okay. And your medical findings don’t exclude that, do they?
A. They do not, but they would lean strongly against it.
Q. But you can’t swear under oath it didn’t happen, can you?
A. No, I cannot do that.
Q. And people who have had concussions have walked around before like in football, high school football, for instance?
A. They have, but by definition, they’re going to have a momentary period of unconsciousness by definition.
Q. And you believe in this particular case that Mr. White would have had a moment of unconsciousness?
A. Yes, sir.
Q. And then been conscious again?
A. That’s a possibility, Counselor. He could have remained unconscious. That is certainly a distinct possibility.
During redirect, the prosecution asked Dr. Hayne again whether he thought White would have been standing when Booker beat him to death. Dr. Hayne reiterated and testified that at the time Booker hit White, he “would expect [White] not to be in a standing position unless he was supported.”
¶ 41. “An error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty.” Young, 981 So.2d at 313 (¶ 17) (quoting Forrest v. State, 335 So.2d 900, 903 (Miss.1976)). In Gray v. State, 799 *1002 So.2d 53, 61 (¶ 30) (Miss.2001), the Mississippi Supreme Court explained the difference between reversible and harmless error as follows:
To warrant reversal, two elements must be shown: error, and injury to the party appealing. Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case; it is prejudicial, and ground for reversal, only when it affects the final result of the case and works adversely to a substantial right of the party assigning it. Obviously, in order for the rule of harmless error to be called into play in support of a judgment, the judgment must be otherwise supportable, and will be reversed when there is nothing in the pleadings or evidence to support it.
1142. It is important to consider that, even if the evidence was undisputed that White was the initial aggressor, the jury could have still found Booker guilty of manslaughter. See Cooper v. State, 911 So.2d 665, 671-72 (¶ 27) (Miss.Ct.App. 2005). The extent of force used by Booker in exerting his claim of necessary self-defense was front and center in this case. The jury was instructed that the degree of force used in necessary self-defense must be measured by the degree of the threat of harm that was apparent from the circumstances. A reasonable juror could have concluded that Booker could have readily subdued any threat White posed without beating White to death. As of March 12, 2007, Booker was a twenty-three-year-old man in prime physical condition who relatively recently had returned from active duty with the United States Army. Booker was 5'11 and weighed 170 pounds. However, Booker testified that he worked out “[p]retty much everyday,” and at that time, he could bench press approximately 405 pounds while wearing a particular shirt designed to aid weightlifters. White was sixty-one years old and two inches shorter than Booker. Testimony indicated that White had high blood pressure, hardening of the arteries, and he was borderline diabetic. He was certainly not as physically conditioned as Booker. The prosecution repeatedly asked Booker if he was afraid of White and whether it was necessary to act as he did. Booker simply answered that he “just reacted” and that he did not know whether he could have subdued White in some way short of beating him to death. Because the jury could have still Booker found guilty even if Morgan’s testimony did not make Booker’s version of events less credible, we find that Booker was not prejudiced by Morgan’s testimony. We find no merit to this issue.
IV. SHADE’S TESTIMONY
¶43. Booker claims the circuit court erred when it allowed White’s grandson, Shade, to testify when the prosecution did not list him as a witness and his statement to the police was never produced as discovery by the State. The prosecution made an offer of proof of Shade’s testimony. Shade testified that he heard Booker’s truck the night after White had confronted Booker on March 10, 2007. Shade’s father, Keith, testified similarly. The circuit court found that Shade’s proffered testimony was included in a statement given by his father, Keith, several months prior to the trial. Furthermore, the circuit court found that there was no substantive difference in Shade’s proffered testimony and the information included in Keith’s statement. Accordingly, the circuit court held that Shade’s testimony did not unfairly surprise Booker; therefore, he would experience no prejudice as a result of some unfair advantage to the prosecution.
*1003 ¶44. This Court has previously held that “[f]or a discovery violation to require reversal there must be a showing of prejudice and the non-disclosed material must be more than simply ‘cumulative.’” McCoy v. State, 811 So.2d 482, 484 (¶ 15) (Miss.Ct.App.2002). We do not find the circuit court abused its discretion when it allowed Shade to testify. Shade’s testimony was cumulative of Keith’s testimony. Accordingly, Booker was not prejudiced by any unfair advantage to the prosecution. Therefore, this issue is without merit.
V. EXCLUSION OF BOOKER’S EVIDENCE
¶ 45. Booker claims the circuit court erred when it refused to allow him to introduce testimony from Wayne Hogue, Noel Jackson, and a statement that had been given by Nance.
A. Wayne Hogue’s Testimony
¶ 46. The record does not contain
a formal proffer of Hogue’s testimony, but the prosecution agreed that Booker’s attorney’s summarization of what Hogue’s testimony would have been was sufficient to create an adequate record for review. According to Booker’s attorney, Hogue would have testified that he and White were involved in a confrontation approximately three-and-one-half years earlier. Specifically, Booker’s attorney told the circuit court that Hogue was stopped at a stop sign when White got out of his own car and approached Hogue because White thought Hogue had been driving too slowly. According to Booker’s attorney, White said: “What are you doing on my d— road you son of a b-?”
¶47. The circuit court excluded Ho-gue’s testimony because it merely demonstrated that White had engaged in a verbal confrontation, and it did not tend to show that White was more likely to have been the initial physical aggressor in the confrontation at issue. On appeal, Booker revisits his argument that Hogue’s experience with White is demonstrative of White’s aggressive personality. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. M.R.E. 401. If evidence is irrelevant, it is not admissible. M.R.E. 402.
¶48. Pursuant to Mississippi Rule of Evidence 404(a), “[ejvidence of a person’s character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion.” However, evidence that would otherwise be excluded under Rule 404(a) is admissible if it is “[e]vidence of a pertinent trait of character of the victim of the crime offered by an accused....” M.R.E. 404(a)(2).
¶ 49. The precise issue is whether Ho-gue’s verbal confrontation with White three-and-one-half years earlier makes it more probable that White was the initial physical aggressor with Booker. We find that it does not. There was no indication that Hogue would have testified that White was physically aggressive during their confrontation — much less that White was the initial physical aggressor. Consequently, Hogue’s testimony would not have made it more likely that White was the initial aggressor on March 12, 2007. It follows that Hogue’s testimony was irrelevant to the issue of whether White was the initial physical aggressor on March 12, 2007.
¶ 50. “[Mississippi Rule of Evidence] 403 is the ultimate filter through which all evidentiary objections eventually flow.” Ware v. Entergy Miss., Inc., 887 So.2d 763, 774 (¶29) (Miss.2003). “Although relevant, evidence may be excluded *1004 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” M.R.E. 403. Assuming for the sake of discussion that Hogue’s testimony was not irrelevant, it would have been confusing and misleading to the jury. The jury would have been led to believe that because White was verbally aggressive with Hogue approximately four years earlier, he was more likely to have been the initial aggressor on March 12, 2007. Accordingly, the nonexistent probative value of Hogue’s testimony would have been outweighed by the massive prejudicial effect that would have stemmed from misleading the jury. This issue lacks merit.
B. Noel Jackson’s Proffered Testimony
¶ 51. According to Booker’s attorney, Jackson would have testified that his father had been an adjoining landowner to White, and they apparently were once involved in a dispute over a road or a driveway. Jackson’s father had placed a chain up across the driveway or road and rendered it inaccessible. According to Booker’s attorney, approximately twelve or thirteen years earlier, Jackson’s father had told Jackson that White “cursed his father” during their dispute. Booker’s attorney sought to introduce Jackson’s hearsay testimony to demonstrate that White “had a bad temper and he was overbearing.” The circuit court excluded Jackson’s testimony because the incident was “too far removed from the present incident.” On appeal, Booker claims the circuit court abused its discretion.
¶ 52. Hearsay consists of an out-of-court statement, other than one made by the declarant while testifying, that is offered as evidence to prove the truth of the matter asserted. M.R.E. 801(c). Hearsay is not generally admissible. M.R.E. 802. Assuming for the sake of argument that Jackson’s testimony was admissible as an exception to the hearsay rule, the circuit court did not abuse its discretion when it excluded Jackson’s testimony.
¶ 53. In Gates v. State, 936 So.2d 335, 339 (¶ 13) (Miss.2006), the Mississippi Supreme Court analyzed an issue in which the defendant in that case argued that it was proper to question a shooting victim regarding a “purported prior incident in justice court some weeks or months before the shooting at hand as any allegation of a violent tendency of the victim was directly pertinent to Gates’s defense.” However, the supreme court found no error and held that “the purported charges in justice court were too remote in time to have any bearing on the case at hand.” Id. at (¶ 15).
¶ 54. Additionally, as with Hogue’s confrontation with White, there was no indication that White was physically aggressive with Jackson’s father — much less that he was the initial physical aggressor. Jackson’s proffered hearsay testimony would not have made it more likely that White was the initial physical aggressor on March 12, 2007. Accordingly, Jackson’s hearsay testimony is not only too remote in time to be admissible — it is also irrelevant, and its probative value is outweighed by its prejudicial effect. This issue is without merit.
C. Phillip Nance’s Statement
¶ 55. On April 30, 2007, Nance gave a statement to Cox, an investigator who had been hired by Booker’s attorney. Nance died before Booker’s trial commenced. However, Nance’s statement indicated he saw Booker shortly before his altercation with White on March 12, 2007. Nance said that Booker told him that White had confronted him about the speed at which he was driving down the road on *1005 which they both lived. Nance told Cox that Booker did not think it was necessary to involve the authorities. However, Nance also told Cox that Booker was not upset or aggravated at the time he was telling Nance about his confrontation with White. Nance also gave a similar statement to authorities.
¶ 56. Nance’s statement also included his opinion that, in his experience, Booker was generally respectful and calm and that it was uncharacteristic of him to be involved in such an altercation as the one that occurred on March 12, 2007. The circuit court found that those portions of Nance’s statement were inadmissible. The circuit court then informed Booker’s attorney that Nance’s statement would be admissible as redacted. Both of Nance’s statements, including his redacted statement to Cox, were admitted into evidence.
¶ 57. The record indicates that, along with the Nance’s statement and Booker’s own testimony, two other witnesses testified regarding Booker’s demeanor when White confronted him about the speed at which Booker drove two days before the homicide. Medlin testified that he was with Booker when White confronted them. According to Medlin, Booker was respectful with White. He also testified that Booker was “calm” and “peaceful.” Additionally, Rickey Thrasher also testified that Booker described his confrontation with White regarding Booker’s driving. According to Thrasher, Booker “never had any ill manner about him whatsoever.” Thrasher also testified that Booker had a good reputation in the community. Specifically, Thrasher testified that his children knew Booker and that Booker had “always been a good kid.” What is more, Booker testified that while he was serving in the United States Army, among other commendations, he received a “Good Conduct Medal after [he] became the [sic] sergeant for three years of meritorious service ... without a problem of any kind of violence or anything like that.”
¶58. Considering the totality of the cumulative evidence, we find that the circuit court did not abuse its discretion when it excluded the portion of Nance’s statement that is currently at issue. This issue lacks merit.
VI. KEITH’S TESTIMONY REGARDING THE LOCATION OF WHITE’S BASEBALL CAP
¶59. In his final issue, Booker claims the circuit court erred when it allowed Keith to testify that White’s baseball cap was found inside the Rhino ATV. At trial, Booker argued that the prosecution “never ever tendered in discovery in writing or verbally ... that they were going to try to use [the position of White’s baseball cap] to contradict [Booker’s] version of events.” Booker’s attorney also stated that their defense theory was “that this is a Weathersby Rule case; that there was no physical evidence to contradict [Booker’s] version of the events.”
¶ 60. However, Booker’s attorney admitted that he had “a report from ... the crime scene unit saying there’s a hat in the Rhino.” The prosecution responded and mentioned that a report by Deputy Chris McCallister of the Tippah County Sheriff’s Department also mentioned that there was a “cap lying between the seats of the ATV.” The circuit court held that it was “up to the jury to determine whether or not they believe if he had [the baseball cap] on or he didn’t have it on.” The circuit court further held that the location of White’s “glasses [at the scene of the crime] appear to contradict [Booker’s version of events], if that’s the theory anyway, so the objection is overruled.” Keith then testified that he saw his father’s baseball cap on the passenger-side floorboard of *1006 the Rhino ATV when he arrived at the scene.
¶ 61. On appeal, Booker claims the circuit court erred when it allowed Keith to testify regarding the location of White’s baseball cap. “The trial court has considerable discretion in matters pertaining to discovery, and its exercise of discretion will not be set aside in the absence of an abuse of that discretion.” King v. State, 857 So.2d 702, 714 (¶ 12) (Miss.2008) (citing Gray, 799 So.2d at 60 (¶ 26)). “For a discovery violation to require reversal there must be a showing of prejudice and the non-disclosed material must be more than simply ‘cumulative.’ ” McCoy, 811 So.2d at 484 (¶ 15). We do not find that the circuit court abused its discretion. First and foremost, Keith’s testimony at issue was not the only evidence that contradicted Booker’s version of events. Dr. Hayne’s testimony also contradicted Booker’s version of events—as did Morgan’s. Furthermore, the location of White’s glasses contradicted Booker’s version of events.
¶ 62. Additionally, Booker’s attorney admitted that he had received “a report from ... the crime scene unit saying there’s a hat in the Rhino.” Booker’s attorney did not dispute the prosecutor’s statement that Deputy McCallister’s report referenced the fact that a baseball cap was found “lying between the seats of the ATV.” What is more, Booker never argued that the prosecution failed to disclose that Keith would be testifying for the prosecution or that Keith was expected to testify that he was at the scene of the crime shortly after the fact. Although the facts in Steadham v. State, 995 So.2d 835, 838 (¶ 7) (Miss.Ct.App.2008) are not directly on point with the facts in this case, in Stead-ham, this Court held that where a witness had been properly disclosed during discovery, that witness’s “expanded testimony at trial does not amount to reversible error.” There is no indication that Booker’s attorney or the investigator that he employed ever attempted to interview Keith prior to the trial. Finally, Booker’s attorney did not request a continuance. “If the defense feels that it has been ‘unfairly surprised’ by undiscovered evidence, it is required to ‘affirmatively request a continuance.’ ” Steadham, 995 So.2d at 837-38 (¶ 6) (quoting Robinson v. State, 749 So.2d 1054, 1061 (¶ 19) (Miss.1999)). This issue is without merit.
CONCLUSION
¶ 63. “A criminal defendant is not entitled to a perfect trial, only a fair trial.” McGilberry v. State, 741 So.2d 894, 924 (¶ 126) (Miss.1999) (citing Sand v. State, 467 So.2d 907, 911 (Miss.1985)). Booker received a fair trial. Before sentencing Booker, the trial judge, Judge Henry Lackey, a seasoned and experienced trial judge, summarized the case quite well. Judge Lackey stated as follows:
I want to commend these attorneys. I’ve been on the bench since 1993, and I don’t recall another trial that was as well tried as this trial. Apparently, everything that was supposed to have been presented was presented, and they gave me a great deal of courtesy during the trial.
I, of course, heard the trial. I saw the exhibits. Mr. White’s son testified that when he got to his dad, if I recall correctly, that he recognized the vehicle he was in, but he didn’t recognize his dad. Ms. Morgan, I believe, was the nurse that lived in the neighborhood and came long and was giving the gentleman life support, trying to, and she had known him for many years, but she didn’t recognize him. I saw the pictures and, quite frankly, I don’t believe that the type damage that was done could have been administered with three blows. I *1007 may be wrong. It’s my opinion that Mr. White never got out of the vehicle he was in, because with the damage to his head and face, I don’t believe that he could have gotten back in that vehicle. He may have, may could have.
It’s true that Chad is a young man, and I have several options I can consider. I can consider the factor that he was on his own property, but that did not give him the right to use excessive force. It is alleged that Chad was not the aggressor, but the Court is of the opinion that that was rebutted by the circumstances and the facts in that I don’t see how Mr. White could have gotten out of that all-terrain vehicle, taken the beating that was administered to him as evidenced by the pictures, and then gotten back in that vehicle. I just ... don’t see how that could have happened.
Having found no merit to any of Booker’s six issues on appeal, we affirm the judgment of the circuit court.
¶ 64. THE JUDGMENT OF THE TIPPAH COUNTY CIRCUIT COURT OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TEN YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION AND TO PAY $25,000 IN RESTITUTION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P JJ., GRIFFIS AND MAXWELL, JJ., CONCUR. IRVING, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. ISHEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J. BARNES AND CARLTON, JJ., NOT PARTICIPATING.

. Nance died on July 28, 2008, and his statements were introduced into evidence at trial. A redacted version of his statement to Cox was introduced.