ON WRIT OF CERTIORARI

CARLSON, Presiding Justice, for the Court:
¶ 1. Chad Booker was convicted of manslaughter in the Tippah County Circuit Court, Judge Henry L. Lackey presiding, and was sentenced to twenty years in the custody of the Mississippi Department of Corrections, with ten years suspended and five years of post-release supervision. Booker appealed, and we assigned this case to the Court of Appeals. After the Court of Appeals affirmed the trial-court judgment, we granted Booker’s petition for writ of certiorari. Finding that no reversible error occurred at trial, we affirm the judgment of the Court of Appeals affirming the Tippah County Circuit Court judgment.
FACTS AND PROCEEDINGS IN THE TRIAL COURT
¶ 2. The following history has been developed from the facts and trial-court proceedings as set forth in the Court of Appeals’ opinion. Booker v. State, 64 So.3d 988, 992-95 (¶¶ 2-11) (Miss.Ct.App.2010). We will add additional facts found in the record as needed for the sake of today’s discussion.
¶ 3. The events that set Booker’s conviction into motion began as a dispute between neighbors who all lived near the intersection of County Roads 813 and 817 in the Palmer Community of Tippah County. That dispute culminated in the death of sixty-one-year-old David White. White and his adult son, Keith White (Keith), owned an all-terrain vehicle (ATV) shop that was located behind White’s house. Booker’s parents, Buster and Frieda Booker, lived across the street from White. Booker, who had his own home near his parents and White, was a twenty-three-year-old veteran of the United States Army at the time his dispute with White arose. As of March 2007, Booker operated an auto body shop and studied radiology at Blue Mountain College.
¶ 4. On Saturday, March 10, 2007, White and Keith were working at their ATV shop. Booker drove a 1990s model Ford Mustang by the ATV shop. According to Keith, Booker drove the Mustang past the shop at approximately seventy-to-eighty miles per hour. Booker and his passenger, Tyler Medlin, disputed Keith’s estimate of their speed. They testified that Booker was driving at a speed between forty and fifty miles per hour when they passed the Whites’ ATV shop. White was of the opinion that Booker had been driving too fast. When White and Keith-heard the Mustang coming back, White went outside and flagged Booker down. According to both Booker and Medlin, White had come running outside and angrily told Booker that he was driving too fast. When Booker said that he was test driving the Mustang because he could not get it to shift into third gear, White said, “Not on my d — road!” Medlin and Booker both later testified that Booker had remained calm and told White that he should call the authorities if he had a problem. When White returned to his house, he did exactly that.
¶ 5. Unfortunately, that was not the end of the dispute. According to Keith, later *968 that evening, Booker had stopped at the end of White’s driveway, put his truck in neutral, and revved the engine. Keith testified that Booker had driven past White’s house approximately four times that night, and on his last pass, he had yelled “f— you.” Shade White (Shade), Keith’s son and White’s grandson, also testified that he had heard Booker’s truck stop in front of the house either four or five times and that he had heard Booker rev his engine.
¶6. White’s wife, Charlotte, testified that Booker’s parents each had called their house on Sunday afternoon at separate times regarding the confrontation between White and Booker. According to Charlotte, the call from Booker’s parents had led to a discussion about whether White should apologize to Booker. White had not thought he needed to apologize to Booker. However, Charlotte testified that the last thing she had heard White say regarding the subject was, “I’m going to apologize.”
¶ 7. It is undisputed that Booker beat White to death the next evening. Phillip “Possum” Nance gave statements to Terry Cox, an investigator employed by Booker’s defense attorney, and Agent John Hill-house of the Mississippi Bureau of Investigation (MBI). In both statements, Nance said that Booker had stopped by his used-car dealership on March 12. According to Nance, Booker had told him about his confrontation with White two days earlier. Nance stated that Booker had been confused as to why White had called the police. Nance told Agent Hillhouse that Booker had been calm and that he had not said anything about retaliating against White. However, Nance also said that, according to Booker, during the confrontation the previous Saturday, Booker had told White that he (White) could call the authorities, or he (Booker) could get out of the Mustang so they could “settle it like men.”
¶ 8. On Monday, March 12, 2007, Keith and White were returning home from picking up an ATV. Keith testified that, on their way home, they saw Booker at his shop, and they waved at him. Keith testified that Booker had waved back. Booker later corroborated Keith’s testimony. According to Keith, after they had arrived at their shop, White decided to go apologize to Booker in an attempt to make peace. Keith testified that he had watched White drive his Yamaha Rhino ATV to Booker’s house. Keith had gone back in the shop. Keith also testified that White had appeared calm when he had left. When White arrived at Booker’s property, Booker was placing trash in the bed of a truck parked near the end of his driveway, which connects to the county road.
¶ 9. According to Booker, White had come “flying down [County Road] 813” to his property in a Rhino[1] “and kinda spun like he was going to do a U there” in Booker’s driveway. Booker explained that White had parked in his driveway,[2] turned off the Rhino, got out of it quickly, and told Booker that he had to talk to him. Booker testified that he had told White to leave his property because he did not want to talk to him. Booker also testified that White had said, ‘You’re going to talk to me.” According to Booker, White had attempted to grab Booker’s collar with one hand and tried to punch him with the other hand. Booker testified that he had grabbed White’s wrist, and while pulling *969 White toward him, he had punched White in the face three times. Booker further testified that White had stumbled away and had sat back down in the Rhino.
¶ 10. Booker walked away from the scene of the altercation. According to Booker, White had been still standing when he had left. Booker later explained that he had walked down the road and called his cousin Wendell Booker (Wendell). Booker asked Wendell to come get him because he “had been in a bad situation.” Shortly after Wendell had picked him up, Booker’s mother called him. Booker returned to his shop, where he was taken into custody by officers with the Tippah County Sheriffs Department.
¶ 11. Brenda Morgan, a certified nurse who formerly had worked in the emergency room and intensive-care unit of the local hospital, happened to drive by the scene a short time later. Morgan knew White, but she did not recognize him. She stopped solely because she saw someone slumped over in an ATV. White was unconscious and slumped over the center console of the Rhino. The left side of White’s face was extremely swollen, and he was bleeding from both ears and his nose. Blood was on the center console shift handle. White’s glasses were in the county road, adjacent to the Rhino,[3] and his baseball cap was on the passenger-side floorboard of the Rhino. Morgan did not detect a pulse on White’s wrist or his neck. Morgan called 911, and then she and Jeff Butler, who also had stopped as he drove by, got White out of the ATV and began to perform CPR. Another of White’s neighbors, Clinton Bryant, drove by and noticed that something appeared to be wrong with White. Bryant found Keith and told him that White appeared to need help. When Keith arrived at Booker’s house, he found Morgan and Butler tending to his father. Despite the efforts of emergency responders, White was unable to recover from his injuries.
¶ 12. Booker was indicted for murder. He pleaded not guilty, and the case ultimately went to trial. At the conclusion of Booker’s trial, the circuit court instructed the jury on murder and manslaughter; the jury found Booker guilty of manslaughter. Booker, 64 So.3d at 992-95 (¶¶ 2-11).
PROCEEDINGS IN THE COURT OF APPEALS
¶ 13. Before the Court of Appeals, Booker raised the following six issues: (1) the circuit court erred in denying Booker’s motions for a directed verdict, judgment notwithstanding the verdict, and a new trial; (2) the circuit court failed to properly instruct the jury; (3) the circuit court erred in allowing Morgan to give opinion testimony; (4) the circuit court erred in allowing Shade to testify; (5) the circuit court erred in refusing to admit evidence offered by Booker; and (6) the circuit court erred in allowing testimony concerning where White’s cap was found. Booker, 64 So.3d at 994-95 (¶ 11).
DISCUSSION
¶ 14. The majority for the Court of Appeals found no merit in Booker’s arguments.[4] After the Court of Appeals denied Booker’s motion for rehearing, Booker filed a petition for writ of certiorari, asking us to consider several issues, *970 including the issue of whether the trial court erred in failing to grant a directed verdict of acquittal under the Weathersby rule. Weathersby v. State, 165 Miss. 207, 147 So. 481, 482 (1933). In granting cer-tiorari, we have the authority to “limit the question on review.”[5] Miss. R.App. P. 17(h). Brown v. State, 39 So.3d 890, 895 (Miss.2010) (citing Brown v. State, 986 So.2d 270, 272 n. 1 (Miss.2008); Dora v. State, 986 So.2d 917, 921 n. 8 (Miss.2008)).
¶ 15. We specifically note our agreement with the Court of Appeals’ finding that the Weathersby rule was inapplicable under the facts of this case. We write today to expand the Court of Appeals’ discussion on this issue inasmuch as this Court is divided on the issue of whether the Weathersby rule applies in today’s case based on the record before us. With regard to Booker’s remaining issues, we find the Court of Appeals very ably discussed these issues, correctly applying the law to the facts as revealed in the record. Accordingly, we adopt the Court of Appeals’ analyses on these remaining issues, and we find them to be without merit. Booker, 64 So.3d at 994-1007 (¶¶ 15-63).
¶ 16. We turn now to our discussion of the Weathersby rule, and we restate the issue for the sake of our discussion.
WHETHER THE TRIAL COURT ERRED BY REFUSING TO GRANT BOOKER’S MOTION FOR A DIRECTED VERDICT UNDER WEATHERSBY.
¶ 17. The Weathersby rule states,
where the defendant or the defendant’s witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the ‘physical facts or by the facts of common knowledge.
Weathersby v. State, 165 Miss. 207, 147 So. 481, 482 (1933) (emphasis added). This Court also has recognized that, if the defendant’s testimony “satisfies all the elements of murder or manslaughter, the defendant would not be entitled to a directed verdict of acquittal, as [this] testimony would be the basis for a valid eonviction[,]” and the Weathersby rule would not apply. *971 Johnson v. State, 987 So.2d 420, 425 (Miss.2008).
¶ 18. We find Weathersby inapplicable for two distinct reasons: (1) Booker’s version of the incident satisfies the elements of manslaughter, and (2) Booker’s version “is substantially contradicted in material particulars” (a) by credible witnesses, including the prosecution’s witnesses; (b) by the physical facts at the crime scene; and (c) by the facts of common knowledge. Weathersby, 147 So. at 482; see Johnson, 987 So.2d at 424-25.

1. Elements of Manslaughter

¶ 19. Mississippi Code Section 97-8-85 (Rev.2006) “contemplates alternative theories to sustain a manslaughter conviction in that the crime may be charged as a killing in ‘a cruel or unusual manner’ or ‘by use of a deadly weapon.’ ” See Martin v. State, 818 So.2d 380, 382 (Miss.Ct.App.2002) (citing Miss.Code Ann. § 97-3-35 (Rev.2006)). “It is a general rule that where a statute denounces as an offense two or more distinctive acts, things, or transactions enumerated therein in the disjunctive, the whole may be charged conjunctively and the defendant found guilty of either one.” Martin, 818 So.2d at 382 (quoting Lenoir v. State, 237 Miss. 620, 623, 115 So.2d 731, 732 (1959)). To find Booker guilty of the lesser-included offense of manslaughter, the jury could have found, among the other requisite elements, that Booker had killed White in a “cruel or unusual manner” or “by use of a deadly weapon.” Martin, 818 So.2d at 382; Miss.Code Ann. § 97-3-35.
¶ 20. The Court of Appeals found that the learned trial judge correctly had determined that the Weathersby rule was not applicable to the facts of this case. Booker v. State, 64 So.3d at 994 (¶¶ 12-14). Specifically, the Court of Appeals reasoned that “Booker’s version of the incident satisfie[d] the elements of manslaughter” under Mississippi Code Section 97-3-35 (Rev.2006).[6] Id. at 994 (¶ 14). In other words, even if the jury believed that White had attacked Booker, the jury reasonably could have found, based on Booker’s version of the incident, that Booker did not act in necessary self-defense and was guilty of manslaughter.
¶ 21. Although the Court of Appeals did not specifically articulate how Booker’s version of the incident would have satisfied the elements of manslaughter at that point in the opinion, the Court of Appeals later stated:
It is important to consider that, even if the evidence was undisputed that White was the initial aggressor, the jury could have still found Booker guilty of manslaughter. See Cooper v. State, 911 So.2d 665, 671-72 (¶27) (Miss.Ct.App. 2005). The extent of force used by Booker in exerting his claim of necessary self-defense was front and center in this case. The jury was instructed that the degree of force used in necessary self-defense must be measured by the degree of the threat of harm that was apparent from the circumstances. A reasonable juror could have concluded that Booker could have readily subdued any threat White posed without beating White to death. As of March 12, 2007, Booker was a twenty-three-year-old man in prime physical condition who relatively recently had returned from active duty with the United States Army. Booker was 5'11 and weighed 170 *972 pounds. However, Booker testified that he worked out “[p]retty much everyday,” and at that time, he could bench press approximately 405 pounds while wearing a particular shirt designed to aid weightlifters. White was sixty-one years old and two inches shorter than Booker. Testimony indicated that White had high blood pressure, hardening of the arteries, and he was borderline diabetic. He was certainly not as physically conditioned as Booker. The prosecution repeatedly asked Booker if he was afraid of White and whether it was necessary to act as he did. Booker simply answered that he “just reacted” and that he did not know whether he could have subdued White in some way short of beating him to death.
Booker, 64 So.3d at 1002 (¶ 42) (emphasis added). Based on Booker’s testimony that he had struck White three times in the head, the jury could have concluded that Booker did not act in necessary self-defense and was guilty of manslaughter.
¶ 22. This Court agrees. In Cooper, affirming a manslaughter conviction, the Court of Appeals found that the jury could have considered whether the defendant had used excessive force when striking the alleged aggressor for a second time with a baseball bat:
A reasonable, hypothetical juror could conclude that Cooper, having landed the first blow to Kenneth’s skull, acted unreasonably when he struck Kenneth in the head again. Not only did he strike him again, he struck him with an aluminum baseball bat. It is not outside the realm of possibility that a reasonable hypothetical juror could find that Cooper did not act in self-defense because Cooper, having landed a previous skull-crushing blow with a baseball bat, delivered a second skull-crushing blow. A reasonable hypothetical juror could conclude that Kenneth would have been incapacitated by a strike with force sufficient to shatter his skull, so that he could not have presented a reasonable threat sufficient to warrant a similar follow-up strike to Kenneth’s head.
While testimony indicated that Cooper acted in self-defense and defense of others, testimony also indicated that Cooper acted unreasonably.... Under the circumstances, we defer to the jurors as finders of fact, and the jury found that Cooper acted unreasonably under the circumstances when the jury found Cooper guilty of manslaughter.
Cooper, 911 So.2d at 671-72. Under Cooper, when a defendant, upon being attacked, repeatedly strikes another with a deadly weapon, in the heat of passion but no longer in necessary self-defense, then this defendant can be guilty of manslaughter. Cooper, 911 So.2d at 671-72.
¶ 23. In Cooper, the defendant used a baseball bat as a deadly weapon. Id. Booker testified that he had retaliated with his fists. This Court has stated that whether a defendant’s fists constitute a deadly weapon is a jury question. In Pulliam v. State, 298 So.2d 711, 713 (Miss.1974), a case decided under the former aggravated-assault statute (Section 2011, Mississippi Code, 1942 Annotated (1956)),[7] this Court stated that “[wjhile the use of feet and fists ordinarily would not constitute the use of a deadly weapon, they can constitute a deadly weapon if used with means or force likely to produce death. Whether they are so used is for the jury to determine from the evidence.”[8] See Jack *973 son v. State, 594 So.2d 20, 24 (Miss.1992); see also King v. State, 251 Miss. 161, 168 So.2d 637 (1964) (affirming manslaughter conviction where defendant “stomped” the decedent to death); Johnson v. State, 230 So.2d 810, 811 (Miss.1970) (finding that whether a “shoe clad foot” was a deadly weapon, under the former aggravated-assault statute, was a jury determination “in the light of evidence as to how and in what manner it is employed.”).
¶ 24. Alternatively, the jury could have found that Booker had killed White in a cruel or unusual manner. The majority for the Court of Appeals pointed out:
Booker admitted that he punched White in the head several times, which resulted in White’s death. At best, the evidence indicates that Booker landed three punches to the left side of White’s head while White was attempting to punch him. At worst, Booker punched White in the head while White remained seated in the Rhino. Either of these scenarios is sufficient to constitute “a cruel or unusual manner.” *974 a prima facie case of murder has been made out, particularly in the Court’s opinion, as to the nature and severity of the injuries from the photographs that were taken.
*973 Booker, 64 So.3d at 995 (¶ 17).
¶ 25. We find that Booker’s striking White three times sufficiently presented a jury question as to whether Booker’s actions were cruel or unusual. See Martin v. State, 354 So.2d 1114, 1117-18 (Miss. 1978) (permitting jury instruction for manslaughter based on cruel and unusual manner “where it was uncontroverted that the deceased [a child] was the victim of a brutal beating”). Booker admitted that he had grabbed White, a sixty-one-year-old man in less-than-good health, by the wrists, had pulled White towards him and had punched him. He struck him, not once but three times on the side of the head. Uncontradicted physical evidence showed that White died of blunt-force trauma to his head. Booker’s punches separated blood vessels in White’s brain from his skull, causing White’s brain to bleed and swell, resulting in his death.
¶ 26. Even based on Booker’s version of the incident, the jury reasonably could have found that Booker did not act in necessary self-defense and was guilty of manslaughter, thus making the Weathers-by rule inapplicable.

2. Evidence Substantially Contradicting Booker’s Version of the Incident

¶ 27. On the other hand, evidence in the record substantially contradicts Booker’s claim of self-defense and supports the manslaughter conviction. See Johnson, 987 So.2d at 424 (stating that defendant’s version “if reasonable, must be accepted as true, unless substantially contradicted in material particulars by ... the physical facts ....”) (citations omitted).
¶ 28. After Booker’s counsel moved for a directed verdict at the close of the State’s case-in-chief, the trial judge explained his reasons for denying Booker’s motion under Weathersby:
*974 The Weathersby rule is still alive and, of course, where the defendant and his witnesses are the only witnesses, it must be contradicted in material particulars by credible witness or witnesses, and the Court is of the opinion that the medical personnel that opined that it would be unlikely for Mr. White to have suffered the injuries like he has suffered and to have gotten back into that ATV would have been unlikely contradicts the defendant’s version of what happened and the material particulars. For that reason, the Court is compelled to overrule the defendant’s motion to dismiss.
¶ 29. This Court has recognized the narrow context in which Weathersby applies. In Berry v. State, 455 So.2d 774, 776 (Miss.1984), this Court stated “that it is a rare case which meets the requirements of Weathersby.” Weathersby did not apply
... in Thornhill v. State, 561 So.2d 1025, 1030-32 (Miss.1989), [overruled on other grounds by Bush v. State, 895 So.2d 836, 844 n. 2 (Miss.2005) ], where defendant’s self-defense theory was eroded by the facts that (1) no glass was found under the victim but was only on top of him and to his side, somewhat undermining the story that the victim had broken the window in the door himself; (2) the hammer was not found gripped in the victim’s hand and no prints were on it; (3) there was no glass on the victim’s boots; and, (4) there were no cuts on the victim’s hands or arms....
Heidel v. State, 587 So.2d 835, 839 (Miss.1991) (emphasis added).
¶30. Weathersby does not require the State to offer evidence excluding the defendant’s theory from the realm of possibility; rather, the State must offer evidence that substantially contradicts the material particulars of the defendant’s version of the incident. Weathersby, 147 So. at 482. In making this decision, this Court must “determine whether there was credible evidence that contradicted [the defendant’s] account of the [incident].” Wilson v. State, 956 So.2d 1044, 1048 (Miss.Ct.App.2007).
¶ 31. In Weathersby, the State presented evidence that, if credible, would have created an issue for the jury to decide. Weathersby, 147 So. at 482. As articulated in Weathersby, the State’s evidence did contradict the defendant’s theory about where the defendant was alleged to have been standing during the incident:
The only distinct contradiction of appellant’s version of the killing was some evidence by the state that the shot went through some growing corn in such a manner as to have shown that the defendant could not have been at the point where he said he stood and the deceased at the point where appellant placed him. Other witnesses for the state corroborated in this particular the locations assisted by the appellant. As we see it, under this particular record, these differences are in detail and not in controlling substance. The appellant and his wife, particularly the latter, appeared to have been considerably frightened as the deceased, who had already been to the home of appellant a few moments previously, at which time he threatened both of them with death.... Thus, as would be expected, there ... are some minor discrepancies in the testimony of the husband and wife, which rather strengthens their testimony than weakens it, because this evidences the ab *975 sence of a previously prepared and agreed story on their part.
Id. The State’s evidence did not substantially contradict the defendants’ version of the incident, because this evidence did not contradict the defendants’ version of events in a meaningful way — that is, this evidence pointed to only “minor discrepancies” in detail, easily explained by the defendants’ obvious state of fear. Id. Accordingly, the Court in Weathersby did not find the State’s evidence to “substantially eon-tradic[t]” the defendants’ version of the incident, and the defendants’ version of the events had to be regarded as true. Id.
¶ 32. Unlike in Weathersby, the State’s evidence in the record before this Court today does not point simply to “differences ... in detail” but to differences in “controlling substance” that are not consistent with Booker’s version of the incident. Id. Specifically, evidence in the record supports the State’s theory that Booker attacked White while White was seated in the Rhino.
¶ 33. Pathologist Dr. Steven Hayne testified for the prosecution that, while White “possibly” could have received such a beating and then walked to the Rhino, that this was very unlikely:
[Defense]: Is it possible for Mr. White to have received a blow or blows and received a concussion and still remained
on his feet and gotten back into his vehicle?
[Dr. Hayne]: I couldn’t exclude that, Counselor, but I think that would be very unlikely. In these type of injuries, I would expect the person to suffer a concussion, which you cannot see medically; but statistically, it’s far more probable that the individual suffered a concussion which by definition a person loses consciousness ...
[[Image here]]
[Defense]: So he could have received a concussion, been out on his feet, not gone down, regained consciousness, and gotten in his vehicle?
[Dr. Hayne]: It would be possible, Counselor. I couldn’t exclude that.
[Defense]: You could not exclude that, could you?
[Dr. Hayne]: But I would not favor that at all.
(Emphasis added.) Dr. Hayne testified that White possibly[9] could have received such blows and gotten back into the Rhino; however, based on the physical facts of this case, Dr. Hayne added that he “would not favor that at all.” (Emphasis added.) This expert testimony provided that Booker’s version of the events was “very unlikely.” Accordingly, this expert testimony, admissible under our rules of evidence, substantially[10] contradicted[11] Booker’s *976 version of the incident and created a question for the jury to resolve.
¶ 34. Photographs of the crime scene received into evidence and the location of White’s glasses also substantially contradicted Booker’s version of the incident. White’s glasses were found on the county road adjacent to the Rhino. Photos of the Rhino reveal that it had no windows, making it reasonable to conclude that if Booker had struck White’s head on the left side, that White’s glasses would have been propelled out of the Rhino’s right passenger side and onto the adjacent county road. While this Court recognizes that no crime scene is perfect and that medical intervention had been performed on White before a crime scene had been established, the location of the glasses, adjacent to the Rhino, was consistent with a finding that Booker had attacked White in the Rhino and, importantly, also was inconsistent with Booker’s version of the incident.
¶ 35. Moreover, the jury reasonably could have found that the location of White’s hat on the floor of the passenger side of the Rhino contradicted Booker’s version of the incident. White’s son testified that White typically wore a hat and was wearing one when he went to see Booker immediately before the fatal altercation.[12] Booker stated that he had struck White three times in the head after White had exited the Rhino. The location of the hat inside the Rhino directly contradicts Booker’s version of the incident — namely that White ever had exited the Rhino to engage in the altercation. If White had been outside the Rhino when the altercation occurred, White’s hat, more likely than not, would have been knocked off outside the Rhino. After receiving three blows to the head, common sense dictates that White would not have had the wherewithal to put the hat back on his head before, as Booker alleges, White sat back down in the Rhino.
¶ 36. Outside the jury’s presence and upon objection to the State’s eliciting testimony from White’s son about the hat in the Rhino (based on an alleged discovery violation), Booker’s defense attorney stated that this physical evidence contradicted Booker’s version of events:
[Defense Attorney]: Yes, sir. The defense would object, your Honor, on the basis of the State trying to elicit testimony from this witness that his father’s cap was found inside the Rhino for purposes of eliciting from this witness that the father always wore a cap to try to physically contradict the defendant’s version of the events....
[Court]: Tell me how that contradicts the defendant’s version of how it occurred. That they found the hat in the Rhino?
[Defense Attorney]: If this witness is going to claim daddy always wore a cap and he never took the cap off ... [t]hen the fact that the hat is outside or not outside of the Rhino would physically contradict the defendant’s version of the events, therefore, being in my opinion, the most important piece of physical evidence the State of Mississippi could have....
¶ 37. In sum, the degree and severity of the injuries inflicted upon White discount any inference that the altercation between Booker and White amounted to no more than “a garden-variety fist-fight.” Also, the fact that the victim was found unconscious in his Rhino on Booker’s property; *977 the location of the victim’s glasses; and the location of the victim’s hat, considered, together, substantially contradict Booker’s version of the incident.
CONCLUSION
¶ 38. The learned trial judge correctly found the Weathersby rule to be inapplicable and properly permitted this case to go to the jury. Having considered the rest of Booker’s arguments before the Court of Appeals and found them to be without merit, we adopt the Court of Appeals’ reasoning. Accordingly, we affirm the Court of Appeals’ judgment, which affirmed the trial court’s judgment of conviction and sentence for the crime of manslaughter.
¶ 39. CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TEN (10) YEARS SUSPENDED, TEN (10) YEARS TO SERVE AND FIVE (5) YEARS OF POST-RELEASE SUPERVISION, WITH CONDITIONS, AFFIRMED.
WALLER, C.J., RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND CHANDLER, J. KING, J., NOT PARTICIPATING.

. A Rhino is an ATV with two bucket seats (enclosed with a roll bar), a center-mounted console shifter, and a steel dump bed.

. Photos of the crime scene differ from Booker's testimony as these photos depict the Rhino positioned between the truck (used to stow garbage) and the county road.

. White’s glasses were an estimated four feet from the Rhino and had been damaged.

. Judge Ishee wrote a dissenting opinion, joined by Chief Judge King, opining that Booker’s conviction should have been reversed and the case remanded for a new trial due to erroneously refused jury instructions and erroneous rulings on evidentiary issues. Two judges did not participate.

. For the sake of clarity, we acknowledge that Booker, through counsel, objected at trial to the State’s Jury Instruction S-2A, but the objection to this instruction was to the inclusion of the term, "deadly force." Booker did not object by alleging that the instruction contained an incorrect statement of the law on the elements of manslaughter. In his appellate brief, Booker, through counsel, never argued that the instruction was an incorrect statement of the law, but only that there was insufficient evidence to support the granting of the manslaughter instruction. In his petition for writ of certiorari, Booker, for the first time, attacks the wording of Jury Instruction S-2A by asserting:
[Tjhe "heat of passion” manslaughter statute, Miss.Code Ann. § 97-3-35, requires-that the killing be done "in a cruel or unusual manner, or by the use of a dangerous weapon.” No dangerous weapon was used. Although three quick punches to the head when one is being punched at himself should not be sufficient to constitute "a cruel or unusual manner" as contemplated by the statute, the trial court, at the very least, had a duty to instruct the jury as to the issue so that the jury could make that determination.
Since no contemporaneous objection was made at trial on the issue that the State's proffered manslaughter instruction contained an incorrect statement of the law, Booker is procedurally barred from making this assertion for the first time on appeal. Birkhead v. State, 57 So.3d 1223, 1239 (Miss.2011). Finally, we note that, once the trial court granted the State's proffered manslaughter instruction, Booker withdrew his proposed manslaughter instruction from consideration by the trial court. Thus, the trial court was never given the opportunity to rule on Booker’s proposed manslaughter instruction.

. Mississippi Code Section 97-3-35 (Rev. 2006) defines manslaughter as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense. ...”

. Now Mississippi Code Section 97-3-7 (Rev. 2006).

. If the jury found that Booker’s fists, used repeatedly under the circumstances, constituted a dangerous weapon, then malice would *973 have been implied. When a deadly weapon is used, malice is implied. Wilson v. State, 574 So.2d 1324, 1336 (Miss.1991) (citing Fairchild v. State, 459 So.2d 793, 802 (Miss.1984)). However, no malice is present if the defendant was acting in the heat of passion. Id. Here, according to Booker’s version of the incident, White attacked Booker. Coupled with the facts that White and Booker had been at odds with each other in the days before the altercation, this alleged act of aggression was sufficient to support a finding that Booker repeatedly struck White in the heat of passion and not out of malice. See Jones v. State, 39 So.3d 860, 866 (Miss.2010) (citations omitted) (defining heat of passion as a "state of violent and uncontrollable rage engendered by a blow or certain other provocation given”).

. The dissent takes the position that Dr. Hayne admitted, not stated, on cross-examination that Booker’s version of events was a “distinct possibility.” The exchange between defense counsel and Dr. Hayne, however, was ambiguous:
[Defense Attorney]: And do you believe in this particular case that Mr. White would have had a moment of unconsciousness? [Dr. Hayne]: Yes, sir.
[Defense Attorney]: And then been conscious again?
[Dr. Hayne]: That's a possibility, Counsel- or. He could have remained unconscious. That is certainly a distinct possibility.
[Defense Attorney]: But it’s also a distinct possibility he could have regained consciousness?
[Dr. Hayne]: That’s possible, Counselor, for a very short period of time.
(Emphasis added.) What is crystal clear is that Dr. Hayne maintained that the scenario put forth by Booker was very unlikely and not to be favored based on the facts of the case.

. Essentially; without material qualification; in the main; in substance; materially; in a substantial manner. Blacks’s Law Dictionary 326 (6th ed.1990).

. To disprove. To prove a fact contrary to what has been asserted by a witness. Black's Law Dictionary 1428-29 (6th ed. 1990).

. Booker testified that he could not remember whether White had been wearing a hat at the time of the incident.