# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00114-COA

**LUIS ALBERTO FIGUEROA**                                              **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

DATE OF JUDGMENT:                11/18/2019
TRIAL JUDGE:                             HON. CHRISTOPHER A. COLLINS
COURT FROM WHICH APPEALED:   SCOTT COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        MARK K. TULLOS
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                               BY: META S. COPELAND
DISTRICT ATTORNEY:                  STEVEN SIMEON KILGORE
NATURE OF THE CASE:                CRIMINAL - FELONY
DISPOSITION:                            AFFIRMED - 10/26/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### WILSON, P.J., FOR THE COURT:

¶1. Following a jury trial, Luis Alberto Figueroa was convicted of manslaughter for killing his girlfriend, Frankie Mitchell. On appeal, Figueroa argues that the trial judge erred by refusing a jury instruction on self-defense and by denying his motion for a directed verdict. However, we find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On the night of June 18, 2016, Mitchell died of a stab wound to her chest. The stabbing occurred near the front steps of Figueroa's mobile home on East 7th Street in Forest. Figueroa's daughter Erica testified that Mitchell had knocked on her window sometime after

11 p.m. that night and asked for Figueroa. Erica told her father that Mitchell wanted to see him, and Figueroa went outside to see Mitchell. After Erica went back to bed, she heard Figueroa scream, "She killed me. She killed me." Erica got out of bed and saw her grandfather (Figueroa's father) holding Figueroa just inside the front door of the mobile home. Figueroa dropped a knife inside the mobile home. Erica then noticed Mitchell lying on the ground outside the mobile home. Figueroa was bleeding, and his father helped him to a car and drove him to the hospital. Someone called 911 for help for Mitchell.

¶3. Officer Coshune Bingham of the Forest Police Department responded to the 911 call. By the time Bingham arrived, Figueroa was gone, and Mitchell had died. Bingham noticed a knife on the ground next to Mitchell's body and another knife on the floor inside the mobile home. Bingham secured the crime scene and did not move Mitchell's body or the two knives. Bingham also noticed that Mitchell had a "knot" near one of her eyes. Bingham and other officers then walked to Mitchell's home, which was nearby. It appeared that there could have been an altercation inside Mitchell's home. In the living room, some of the furniture had been turned over or appeared to be out of place, and Bingham noticed what appeared to be "one or two specks" or "light splatter marks of blood" near the entrance to the home. However, Bingham "couldn't really tell . . . exactly what" the specks were. There was not enough to collect samples for testing, and it was too dark to take photographs. The officers "really couldn't say that an incident occurred" at Mitchell's home, and they decided not to collect any evidence or take any photographs at the home.

¶4. Officer Douglas Haynes of the Forest Police Department went to the trauma room at

2

Lackey Memorial Hospital in Forest, where Figueroa was being treated for a stab wound to the chest. Figueroa was trying to talk through a mask and was difficult to understand, but at one point he pulled off his mask and said, "I stabbed her. How is she?"

¶5.    A nurse testified that Figueroa was "yelling" and "combative" and "had a strong smell of alcohol" when he arrived at the hospital. Figueroa's blood-alcohol content was .267 percent. The nurse also testified that Figueroa "yell[ed] that he had killed someone and later said that it was his girlfriend" and "was self-defense." Around 1 a.m., Figueroa was airlifted to the University of Mississippi Medical Center in Jackson.

¶6.    Investigator Tim Rigby of the Forest Police Department testified that Mitchell was found lying on her back about three to five feet from the steps of Figueroa's mobile home. There was a knife on the ground near Mitchell's body and another knife on the floor inside Figueroa's mobile home. Rigby testified that the knives were submitted to the crime lab and that blood was found on both knives. However, no testing was performed to determine whose blood was on either knife. Rigby testified that no one informed him that there were any signs of an altercation at Mitchell's home.

¶7.    Rigby first talked to Figueroa on June 21, 2016 (three days after Mitchell was killed). Rigby advised Figueroa of his *Miranda* rights, and Figueroa signed a waiver of those rights. Figueroa told Rigby that on June 18, he and Mitchell had been drinking throughout the day and that he had been back and forth between his house and Mitchell's house throughout the day. Figueroa said that around 8 or 9 p.m., he had gone to meet Mitchell halfway between his mobile home and Mitchell's home. Figueroa stated he started to hug Mitchell, but she

3

stabbed him in the chest. Figueroa said that he looked down and saw blood and then said,

"You stabbed me." Figueroa stated that he turned and ran back toward his mobile home

while Mitchell chased him. Rigby testified,

> [Figueroa] said when he got back to his [mobile home], he started knocking on the door, trying to get his dad to open the door. And he said [Mitchell] was standing behind him at that point . . . . He said when his dad opened the door, he didn't go inside. He told his dad he'd been stabbed, and he turned around and saw [Mitchell] laying on the ground in front of the steps. He said he then tried to pick [Mitchell] up and check on her, but he started bleeding and then his dad took him to the hospital. At that point, I asked him did he stab [Mitchell]. He said, "No, I did not stab her." He said he didn't know how she got stabbed and he thought she may have stabbed herself.

¶8.     The next day (June 22, 2016), Figueroa asked to talk to Rigby again. Rigby again

advised Figueroa of his *Miranda* rights, and Figueroa again waived those rights. Figueroa

said that he wanted to talk again because he had not told Rigby "the whole truth about what

happened" and "wanted to tell [him] what really happened." Figueroa again told Rigby that

he met Mitchell halfway between his house and her house, that he tried to hug her, that she

stabbed him, that he turned and ran, and that she gave chase. Rigby testified,

> [Figueroa] said he got to the door of his [mobile home] and that [Mitchell] came from behind him and tried to stab him again and that he grabbed her hand . . . . [Figueroa said] he was holding the knife to keep her from stabbing him, and that she put her leg in between his and they both fell backwards off the steps that led into the [mobile home]. And when they fell backwards on the ground the force of the fall must have pushed the knife into her shoulder as he was trying to keep her from stabbing him. [Figueroa] still stated that he never had a knife.

¶9.     On June 22, Figueroa also gave a written statement.[1] In that statement, Figueroa said

---

[1] Figueroa wrote the statement in Spanish, and it was later translated. At trial, the parties stipulated to the accuracy of the translation, and both the translation and the original statement were admitted into evidence.

4

that after Mitchell stabbed him and chased him back to the stairs of his mobile home, he grabbed her by the arm so that she would not stab him again. Figueroa stated that he and Mitchell "both fell" while they were on the stairs and that Mitchell "went down." Figueroa concluded by stating simply, "[I]t was self defense."

¶10. Dr. Mark LeVaughn, the chief medical examiner for the State of Mississippi, testified that Mitchell died of a single stab wound to the right chest/right shoulder area. He testified that the wound was caused by a knife that penetrated down into the chest cavity and caused massive bleeding in the chest cavity and a collapsed lung. He testified that either of the knives in evidence—the one found near Mitchell's body or the one found inside Figueroa's mobile home—could have caused Mitchell's fatal wound. He testified that Mitchell likely died about three to four minutes after she was stabbed.

¶11. After his motion for a directed verdict was denied, Figueroa took the stand in his own defense. Figueroa testified that in June 2016, he was living in the mobile home on East 7th Street in Forest with his daughter Erica and his parents. He had been dating Mitchell, who lived in a house about fifty yards away from his mobile home, for about one year.

¶12. Figueroa testified that he spent the night of June 17, 2016, at Mitchell's house. Figueroa's two other children, who lived with their mother (Tacara) in Hattiesburg, were coming for a visit on June 18. After Figueroa woke up on June 18, he went to the store for beer, charcoal, and meat to grill. His children arrived at the mobile home around 12:30 p.m. Figueroa testified that later that afternoon, he was playing outside with his children when Mitchell began yelling and cursing at them. According to Figueroa, Mitchell was angry

5

because she believed that he was still in a relationship with Tacara. Figueroa testified that his parents took his children to a fair around 3 or 4 p.m., while he remained at the mobile home and drank more beer. Figueroa claimed that while everyone else was gone to the fair, Mitchell came to the mobile home and angrily accused him of having an affair with Tacara. According to Figueroa, Mitchell said, "I know the b*** is in the trailer" and then searched the mobile home looking for Tacara. Figueroa testified that Mitchell left after she did not find Tacara. He said that Mitchell returned later in the day, argued with him again, and then left again when she saw Figueroa's parents and children returning from the fair.

¶13. Figueroa testified that after his parents and children returned from the fair and went to bed, Erica came and told him that Mitchell was outside knocking on the window and asking for him. Figueroa testified that he went outside and saw Mitchell outside her house. He said that he walked toward her and started to give her a hug to try to calm her down. He stated that as he started to hug Mitchell, he felt a "punch" to his chest, and he realized that he was bleeding and that he had been stabbed. According to Figueroa, he said, "You stabbed me. You stabbed me. Why did you stab me?" He claimed that Mitchell then raised her hand to try to stab him again. Figueroa testified that he turned and ran back to his mobile home, with Mitchell chasing him.

¶14. Figueroa stated that he ran up the front steps of his mobile home, but the front door was locked. Figueroa testified that he came back down the steps and "grab[bed] [Mitchell's] right hand with [his] right hand, trying not to get stabbed one more time." Figueroa testified that he was "trying to get the knife away from" Mitchell but that he never actually took the

6

knife from her. Figueroa testified that he and Mitchell started moving back up the stairs, and "some type of way, [Mitchell] just pushe[d] back, and then [they both] fell" backward off the stairs. According to Figueroa, Mitchell "used her foot" to "push" them both "back" off the stairs because she did not want Figueroa to get away and get help.

¶15. Figueroa testified that when he got back up off the ground, he noticed a knife on the ground to Mitchell's right. He claimed that he picked up that knife because he did not want Mitchell to stab him again. Figueroa testified that he went back up the stairs to his mobile home and beat on the door until his father finally opened it. He testified that he then tossed the knife into the mobile home. Figueroa's father then helped him to the car and drove him to the hospital.

¶16. At trial, Figueroa testified repeatedly and adamantly that he "did not stab," "did not kill," and "never stabbed" Mitchell. According to Figueroa, he never had a knife in his hand until after Mitchell had already been stabbed. In fact, Figueroa testified that when he saw Mitchell lying on the ground outside his mobile home, he still "didn't know she had been stabbed" or "what happened to her." He stated that even after he arrived at the hospital, he still did not realize what had happened to Mitchell. Figueroa testified that he did not know anything about the knife that was found near Mitchell's body. He testified that he recognized both knives and that both belonged to Mitchell.

¶17. On cross-examination, Figueroa testified that he "gave two different statements" to Rigby because he was "still under the influence" of painkillers and "was still in shock" when he gave his first statement. Figueroa testified that he asked to give a second statement

7

because when he gave his first statement, he could not "remember . . . the whole scenario of what happened that night."

¶18.     Figueroa requested jury instructions on the excuse of accident, *see* Miss. Code Ann. § 97-3-17 (Rev. 2020), and the justification of self-defense, *see* Miss. Code Ann. § 97-3-15(1)(e) (Rev. 2014).  The trial judge gave the accident instruction but refused the self-defense instruction after finding that the evidence did not support it.  The trial judge instructed the jury on the elements of first-degree murder and the lesser-included offense of heat-of-passion manslaughter.  The jury found Figueroa guilty of manslaughter, and the trial judge sentenced him to twenty years in the custody of the Department of Corrections with two years suspended and eighteen years to serve.  Figueroa filed a motion for a new trial, which the trial judge denied, and a notice of appeal.  On appeal, he argues that the trial judge erred by refusing his proposed jury instruction on self-defense and by denying his motion for a directed verdict.

## ANALYSIS

### I.     Self-Defense

¶19.    "Jury instructions are generally within the discretion of the trial court and the settled standard of review is abuse of discretion." *Nelson v. State*, 284 So. 3d 711, 716 (¶18) (Miss. 2019) (quoting *Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012)).  However, "in homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Id.* at 718 (¶26) (brackets omitted) (quoting *Brown v. State*, 39 So. 3d 890, 899

8

(¶34) (Miss. 2010)). A criminal defendant also "has a right to assert alternative theories of defense, even inconsistent alternative theories." *Reddix v. State*, 731 So. 2d 591, 593 (¶9) (Miss. 1999). Nonetheless, a defendant must "offer *some* evidence to support his . . . theory before the trial court [is] obligated to instruct the jury on it." *Nelson*, 284 So. 3d at 718 (¶26) (emphasis added) (affirming the refusal of an instruction on imperfect self-defense). A trial judge properly refuses a requested instruction that is not supported by the evidence. *Id.*

¶20.    "Our [S]upreme [C]ourt has upheld the trial court's denial of a self-defense jury instruction in a murder case as having no evidentiary basis when the defendant's defense was that the shooting was unintentional and accidental." *Brown v. State*, 33 So. 3d 1134, 1140 (¶22) (Miss. Ct. App. 2009) (citing *Wadford v. State*, 385 So. 2d 951, 955 (Miss. 1980)). In *Wadford*, "[t]he [S]upreme [C]ourt clarified that 'the legal concept of self-defense in a homicide case is based upon justification of a *purposeful* killing because it was necessary to kill in order to save the killer from imminent danger of suffering death or grave bodily harm at the hands of the person killed.'" *Brown*, 33 So. 3d at 1140 (¶22) (emphasis added) (brackets omitted) (quoting *Wadford*, 385 So. 2d at 955). As this Court explained in another case, "a self-defense claim involves the *intentional* killing of a human being"—not an accidental killing. *Birge v. State*, 216 So. 3d 1174, 1177 (¶15) (Miss. Ct. App. 2017) (emphasis added) (holding that the defendant's testimony that he killed the victim "by accident" "negate[d] [his] claim of self-defense").

¶21.    In *Wadford*, the defendant (Wadford) claimed that he shot the victim (Coghlan) by accident. *Wadford*, 385 So. 2d at 953. Wadford testified that he "pulled [his] gun to shoot

9

in the air" and that his only intent was to "scar[e] . . . off" some men who had put their hands on him and begun to scuffle with him. *Id.* Wadford further testified that "the gun went off" by accident and killed Coghlan. *Id.*

¶22. On appeal, Wadford argued that the trial judge erred by refusing his proposed jury instruction on self-defense. *Id.* at 354. However, the Supreme Court rejected Wadford's argument. *Id.* The Court stated that "Wadford's testimony was directed specifically and in detail to establishing that the shooting had been unintentional and accidental." *Id.* The Court reasoned that Wadford's claim of an "accidental slaying" could not "be reconciled with a view that Wadford's act in shooting Coghlan had been purposeful and done because there was a reasonable apprehension on Wadford's part that it was necessary to do so in order to protect himself from grave bodily injury or death at Coghlan's hands, the danger thereof being imminent and impending, and that shooting Coghlan had been necessary to prevent it." *Id.* In short, Wadford's testimony that the gun simply "went off" by accident could not support a claim of self-defense. *Id.* The Court also stated that Wadford's own testimony that "the gun went off" by accident "not only wholly failed to support the theory that he acted in necessary self defense but negate[d] it in detail." *Id.* The Court held that Wadford was not entitled to a jury instruction on self-defense because "[a]n instruction should not be given to a jury submitting a theory which is not supported by the evidence." *Id.*

¶23. As noted above, the Supreme Court also explained that "[t]he legal concept of self defense in a homicide case is based upon justification of a *purposeful* killing because it was necessary to kill in order to save the killer from imminent danger of suffering death or grave

10

bodily harm at the hands of the person killed." *Id.* at 955 (emphasis added). The concept is inapplicable when—as in *Wadford* and the present case—the only evidence offered by the defense is the defendant's own testimony that he killed the victim "unintentionally" and by "accident." *Id.*

¶24. Finally, in *Wadford*, the Supreme Court acknowledged that Wadford had ended his testimony on cross-examination by making a conclusory assertion that he killed Coghlan in "self defense." *Id.* at 954-55. Nonetheless, the Court held that Wadford's assertion was insufficient to justify a jury instruction on self-defense. *Id.* The Court held that "[t]he mere statement by a defendant that he killed his victim in 'self defense' is wholly incapable by itself of raising a factual question requiring its submission to the jury." *Id.* at 954. Rather, a jury instruction on the issue "must be supported by *evidence*." *Id.* (emphasis added).

¶25. As in *Wadford*, Figueroa's testimony "was directed specifically and in detail to establishing that the [killing] had been unintentional and accidental," and he presented no evidence of a "*purposeful* killing" in self-defense. *Id.* at 954-55 (emphasis added). As discussed above, Figueroa was adamant that he "did not stab" and "did not kill" Mitchell. Indeed, Figueroa claimed that even when he saw Mitchell lying on the ground, he still did not "know . . . what happened to her." As in *Wadford*, we conclude that Figueroa's trial testimony and prior statements "not only wholly failed to support the theory that he acted in necessary self defense but negate[d] it in detail." *Id.* at 954.

¶26. We also note that Figueroa's conclusory comments in his written statement and at the hospital that he acted in "self defense" were not sufficient to support a jury instruction on

11

self-defense. As the Court explained in *Wadford*, "[t]he mere statement by a defendant that he killed his victim in 'self defense' is wholly incapable by itself of raising a factual question requiring its submission to the jury." *Id.* A jury instruction on self-defense should be refused unless there is "*evidence*" to support the instruction. *Id.* at 954-55 (emphasis added).

¶27. In summary, by giving Figueroa's requested jury instruction on the excuse of accident, the trial judge allowed Figueroa to present his theory of defense that was supported by the evidence. The trial judge properly refused Figueroa's requested instruction on self-defense because Figueroa failed to present evidence to support it. Indeed, Figueroa's own statements and testimony contradicted and negated a claim of self-defense. Accordingly, we find no error in the trial judge's instructions to the jury.

## II. Sufficiency of the Evidence

¶28. Figueroa also argues that the trial judge erred by denying his motion for a directed verdict.[2] Figueroa contends that he was entitled to a directed verdict and judgment of acquittal pursuant to the "*Weathersby* rule." *See Weathersby v. State*, 165 Miss. 207, 209, 147 So. 481, 482 (1933). However, we conclude that the *Weathersby* rule is inapplicable and that the State presented sufficient evidence for a rational juror to find Figueroa guilty of the

---

[2] Figueroa did not renew his motion for a directed verdict at the conclusion of the trial, but he preserved the issue by requesting a peremptory instruction, which the trial judge refused. *See Jones v. State*, 783 So. 2d 771, 775 (¶10) (Miss. Ct. App. 2000). Figueroa also challenged the sufficiency of the evidence in his motion for a new trial, although he did not specifically ask the court to enter a judgment of acquittal notwithstanding the verdict. In any event, our standard of review is the same regardless of whether the defendant challenged the sufficiency of the evidence by a request for a peremptory instruction or a motion for a directed verdict or a judgment notwithstanding the verdict. *See Taggart v. State*, 957 So. 2d 981, 986 (¶8) (Miss. 2007).

crime of manslaughter.

¶29.  "When this Court reviews the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017).  "We are not required to decide—*and in fact we must refrain from deciding*—whether *we think* the State proved the elements." *Id.* (quoting *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010)).  "Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* (quoting *Poole*, 46 So. 3d at 294 (¶20)).  We will reverse only if "it is impossible to say that a reasonable person could have found" the defendant guilty; "[o]therwise, we must affirm[.]" *Poole*, 46 So. 3d at 294 (¶20).

¶30.  The *Weathersby* rule essentially is a specific kind of challenge to the sufficiency of the evidence.  *Green v. State*, 614 So. 2d 926, 932 (Miss. 1992).  *Weathersby* holds that when

> the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Parvin v. State*, 113 So. 3d 1243, 1252 (¶34) (Miss. 2013) (quoting *Weathersby*, 165 Miss. at 209, 147 So. at 482).  "If the *Weathersby* rule applies 'and the defendant's version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal.'" *Id.* (quoting *Green v. State*, 631 So. 2d 167, 174 (Miss. 1994)).

¶31.  But the *Weathersby* rule applies only in a "narrow context." *Booker v. State*, 64 So. 3d 965, 974 (¶29) (Miss. 2011); *see also Parvin*, 113 So. 3d at 1252 (¶34) ("There are . . .

13

limitations upon the familiar *Weathersby* rule."). Indeed, the Supreme Court has said "that it is a rare case which meets the requirements of *Weathersby*." *Booker*, 64 So. 3d at 974 (¶29) (quoting *Berry v. State*, 455 So. 2d 774, 776 (Miss. 1984)). One limitation on the *Weathersby* rule is that it does not apply when the defendant gives inconsistent accounts of the killing prior to and at trial. *Parvin*, 113 So. 3d at 1252 (¶34).

¶32.    Here, as discussed above, Figueroa gave materially different and inconsistent accounts of the killing in his statements to Investigator Rigby and in his subsequent testimony at trial. Indeed, Rigby testified that Figueroa asked to talk to him a second time because Figueroa had not told him "the whole truth about what happened" and "wanted to tell [him] what really happened." In his first interview with Rigby, Figueroa said that after he knocked on the front door of his mobile home and his father answered, "he turned around and saw [Mitchell] laying on the ground in front of the steps. . . . He said he didn't know how she got stabbed and thought she may have stabbed herself." Figueroa then stated that he did not want to talk to Rigby anymore, and the interview stopped. The next day, however, Figueroa asked to talk to Rigby again. In his second account of the killing, Figueroa stated that he and Mitchell struggled on the steps of the mobile home, "that she put her leg in between his and they both fell backwards off the steps," and that "when they fell backwards on the ground the force of the fall must have pushed the knife into her shoulder." In his second statement to Rigby, Figueroa continued to maintain that he never had a knife. Finally, in his testimony at trial, Figueroa said that after he and Mitchell fell, he saw a knife on the ground, picked it up, and threw it into his mobile home. At trial, Figueroa also testified that he and Mitchell had been

14

arguing throughout the day and that Mitchell had yelled and cursed at his children earlier in the day. Figueroa had not mentioned those incidents in either of his statements to Rigby. Figueroa testified that he "probably just skipped it or didn't remember about it." According to Figueroa, he was still "in shock" at the time of his first two statements to Rigby but remembered more when he gave his second statement. Given that Figueroa gave three different and materially inconsistent versions of the killing, his credibility was an issue for the jury, and the *Weathersby* rule does not apply. *Parvin*, 113 So. 3d at 1252 (¶34).

¶33. Moreover, sufficient evidence was presented for a rational juror to find Figueroa guilty of heat-of-passion manslaughter. A rational juror could have found that Figueroa was not a credible witness, especially given the significant discrepancies between his initial claim that he did not know how Mitchell ended up lying on the ground and his subsequent detailed accounts of a struggle and fall from the steps. A rational juror could have concluded that Figueroa tossed a bloody knife inside his mobile home because he used it to stab Mitchell, not because he simply picked it up off the ground after she accidentally stabbed herself. The evidence showed that Figueroa had been drinking throughout the day and that his blood-alcohol content was .267 percent, and Figueroa himself testified that he and Mitchell had been arguing throughout the day. Based on all the evidence, a rational juror could have concluded that Figueroa stabbed Mitchell during an argument and in the heat of passion. Accordingly, there is sufficient evidence to support the conviction, and the trial judge did not err by denying Figueroa's request for a peremptory instruction and post-trial motion. *See supra* note 2.

15

¶34. Figueroa was not entitled to a jury instruction on self-defense, and the evidence is sufficient to support his conviction for heat-of-passion manslaughter.

¶35. **AFFIRMED.**

**BARNES, C.J., LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., WESTBROOKS, McDONALD AND McCARTY, JJ.**

**GREENLEE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶36. I believe that the judge abused his discretion by refusing Figueroa's requested self-defense instruction. Therefore, I dissent in part.

¶37. "Self defense or justifiable homicide is a defense to a criminal act." *McDowell v. State*, 311 So. 3d 1252, 1263 (¶32) (Miss. Ct. App. 2021) (citing *Brown v. State*, 222 So. 3d 302, 307 (¶20) (Miss. 2017)). "The apprehension or fear that will justify killing another in self-defense must appear objectively real to a reasonable person of average prudence." *Id*. (quoting *Nelson v. State*, 284 So. 3d 711, 716 (¶19) (Miss. 2019)). In other words, "a killing is justified if the person who kills did so under circumstances which would lead a reasonable person under similar circumstances to conclude [he] was in imminent danger of death or great bodily harm." *Wells v. State*, 233 So. 3d 279, 285 (¶12) (Miss. 2017) (quoting *Lentz v. State*, 604 So. 2d 243, 246 (Miss. 1992)).

¶38. Figueroa claims the refusal of his proposed jury instruction regarding self-defense was improper.[3] The proposed instruction read as follows:

---

[3] The proposed jury instruction in question is labeled as D-5.

The [c]ourt instructs you the jury that to make a killing justifiable on the grounds of self-defense, the danger to the Defendant, Luis Alberto Figueroa, must be either actual, present and urgent, or the Defendant must have reasonable grounds to believe that the victim, Frankie Mitchell, intended to kill or do some greatly bodily harm to the Defendant, Luis Alberto Figueroa, and in addition to this, he must have reasonable grounds to believe that there is imminent danger of such act being accomplished. It is for the jury to determine the reasonableness of the grounds upon which the Defendant acts. If you, the jury, unanimously find that the Defendant acted in self-defense, then it is your sworn duty to return a verdict of "Not Guilty" in favor of the Defendant.

¶39.    Figueroa's proposed self-defense jury instruction was refused as being contradictory to the accident instruction that would be given by the court. However, it is well established that "[a] criminal defendant has a right to assert alternative theories of defense, even inconsistent alternative theories." *Reddix v. State*, 731 So. 2d 591, 593 (¶9) (Miss. 1999) (citing *Love v. State*, 441 So. 2d 1353, 1356 (Miss. 1983)). Additionally, "in homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Brown v. State*, 39 So. 3d 890, 899 (¶34) (Miss. 2010). "While a defendant is entitled to jury instructions that present his theory of the case, an instruction may be improper if it incorrectly states the law, is redundant, or lacks foundation in the evidence presented." *Cooper v. State*, 230 So. 3d 1071, 1077 (¶19) (Miss. Ct. App. 2017) (citing *Crook v. State*, 105 So. 3d 353, 358 (¶13) (Miss. Ct. App. 2012)). The lead opinion finds that Figueroa's version of events does not support a self-defense instruction, citing his statements to law enforcement. I disagree.

¶40.    After the incident, Figueroa's father transported him to Lackey Memorial Hospital, where Figueroa was treated for a knife wound to the chest. Samantha Odom was the

17

registered nurse on duty the night Figueroa was admitted to the hospital. According to Odom, Figueroa was combative and smelled strongly of alcohol.[4] Nurse Odom testified for the State that Figueroa said he had killed his girlfriend, but she admitted that he also said the killing was in self-defense.

¶41.    Subsequently, on June 22, 2016, Figueroa spoke with Investigator Rigby. In this version of events, Figueroa stated that after he was stabbed he turned and ran toward his parents' home. He stated that Mitchell followed him up the steps of the home and onto the landing at the front door of the trailer. According to Figueroa, Mitchell attempted to stab him again, and to prevent her from doing so, he grabbed her hand. He and Mitchell fell from the landing to the ground. It was at that point Figueroa assumed that Mitchell had fallen on the knife, stabbing herself. Figueroa also recorded these events in a written statement, stating that "it was self defense."

¶42.    At trial, Figueroa testified that Mitchell stabbed him, and as he turned to run away, she followed him and attempted to stab him again. Figueroa told the court that Mitchell was chasing him with a knife, raising up, and yelling, "I'm going to kill you, mother f*****. I know you're cheating on me with the b****, and I know she's in there. I'm going to kill you today." He testified that when he reached his parents' trailer to get help, a struggle ensued for control of the knife, at which point Mitchell pushed back, causing both of them to fall backward. He explained that as they were falling, the knife was still in Mitchell's right hand. When he stood up, Mitchell sat up, and the knife was no longer in her hand but beside her

---

[4] Upon testing, Figueroa had a blood-alcohol content of .267 percent.

on the ground. Then, Figueroa grabbed the knife to prevent Mitchell from stabbing him again.

¶43.     As stated above, "a criminal defendant has a right to assert alternative theories of defense, even inconsistent alternative theories." *McTiller v. State*, 113 So. 3d 1284, 1292 (¶26) (Miss. Ct. App. 2013). Figueroa consistently asserted that his actions were committed in self-defense. Furthermore, the fact that he was stabbed lends credence to his claim.

¶44.     Because there was evidence to support that Mitchell stabbed Figueroa, indications that Mitchell followed Figueroa to his home, and that a struggle ensued, I believe it was a reversible error for the court to refuse the proposed self-defense instruction. As such, I would reverse and remand for a new trial.

**CARLTON, P.J., WESTBROOKS, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**